IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **ANTHONY QUAIL** | : | **No. 18-315-6** |

### MEMORANDUM

PRATTER, J.                                                                           AUGUST 6, 2020

Anthony Quail moves for temporary pretrial release pursuant to 18 U.S.C. § 3142(i). In support of his motion, Mr. Quail invokes concern for his health and an inability to prepare his defense in light of COVID-19. The Government disputes the merits of Mr. Quail's motion.

For the reasons that follow, the Court denies the motion for release.

### BACKGROUND

#### I.   Mr. Quail's Criminal Conduct

Mr. Quail is alleged to be a mid-to-high level member, specifically, a manager, in the Hilltop Drug Trafficking Group ("DTG"). He is charged with conspiracy to distribute heroin, crack, oxycodone, and alprazolam, as well as related distribution charges. The DTG is allegedly responsible for multiple heroin overdose deaths.

Mr. Quail purportedly had contact with suppliers, packaged bulk heroin for sale, supplied runners with drugs to distribute to customers, and was closely associated with leaders of the DTG. The Government contends that law enforcement observed Mr. Quail and DTG leader Michael Harris resupply two runners with a plastic bag found to contain 12 bundles of heroin and loose packets of heroin in exchange for cash. After conducting a traffic stop of Mr. Quail and Mr. Harris,

Philadelphia police offers recovered $1,176 from Mr. Quail and $1,520 from Mr. Harris. The Government alleges that wire intercepts also identify Mr. Quail as an individual responsible for processing and packaging bulk heroin for resale to customers in cost-effective ways.

Mr. Quail was declared a fugitive on October 2, 2018 after the Superseding Indictment in this matter was unsealed and he could not be located. Investigation by the United States Marshals Service ("USMS") led law enforcement to conclude that Mr. Quail had likely relocated to live with his mother. The USMS Violent Crimes Task Force set up surveillance at Mr. Quail's suspected new residence. After observing Mr. Quail's mother and her boyfriend leaving the home, officers questioned them a few blocks away. Mr. Quail's mother told the officers that she had not seen Mr. Quail for more than a year and that he was not inside the house. She later admitted that this information was untrue and Mr. Quail was inside.

Other officers posted at the home observed Mr. Quail leave the rear of the property and attempted to stop him. At that time, Mr. Quail fled on foot for approximately three blocks before trying to hide. Mr. Quail eventually complied with the officers' orders to surrender, and he was taken into custody. Mr. Quail stipulated to pretrial detention on February 11, 2020 and has since been detained at the Federal Detention Center ("FDC") in Philadelphia.

Prior to the charges in the matter at hand, Mr. Quail was arrested in 2012 for carrying an illegal firearm. He was 17 years old and was placed on juvenile probation with the Youth Violence Reduction Program group. While Mr. Quail was still on supervision, juvenile probation officers found a loaded firearm, ammunition, and more than $2,000 in Mr. Quail's bedroom. He was adjudicated delinquent of his original offense and detained at the Youth Detention Center at Danville. Mr. Quail was later convicted of simple assault in 2015 for physically assaulting a staff member.

## II. Mr. Quail's Medical Concerns

Mr. Quail claims to suffer from asthma, which he asserts places him at a high risk of serious illness or death from COVID-19. His mother affirms that Mr. Quail has suffered from asthma since childhood. Mr. Quail has not provided the Court with any medical records.

## III. The FDC's Response to the COVID-19 Pandemic

Because "maintaining safety and security of [BOP] institutions is [BOP's] highest priority,"[1] BOP has taken significant measures to protect the health of the inmates in its charge. BOP's Pandemic Influenza Plan has been in place since 2012. BOP HEALTH SERVICES DIVISION, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited August 3, 2020). The protocol set forth in this plan established a multi-phase framework which requires BOP facilities to begin preparations in the face of a "[s]uspected human outbreak overseas." *Id.* at i. This plan further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

BOP began planning for potential transmissions related to COVID-19 as early as January, during the same time in which it established a working group to develop COVID-19 policies. In accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmissions. Every BOP institution requires all inmates to be secured in their assigned cells/quarters. Limited group gathering, with social distancing to the extent possible, is permitted to facilitate commissary, laundry, showers, telephone, and computer access. BOP is working to distribute face masks to all staff and inmates and encourages face coverings be worn in public spaces when social distancing is not feasible. Excluding medical

---

[1] BOP, *Updates to BOP COVID-19 Action Plan: Inmate Movement* (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited August 3, 2020).

3

treatment and similar exigencies, BOP has substantially limited the movement of inmates and detainees among its facilities. Official staff travel has also been cancelled, as has most staff training.

Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the Centers for Disease Control and Prevention's (CDC) criteria for release from isolation. All facility staff are screened for symptoms in areas with sustained community transmission. Staff exhibiting a fever of higher than 100.4 degrees Fahrenheit are barred from entering the facility. Similarly, staff members exhibiting a stuffy or runny nose can be placed on leave. Only contractors performing essential services or the necessary maintenance on essential systems may access BOP facilities. Moreover, all volunteer visits have been suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer accessing BOP facilities will accordingly be screened for symptoms and risk factors. As of March 13, 2020, social and legal visits were suspended, with facilities permitting only case-by-case accommodations for visiting attorneys after the attorney has been screened for infection. BOP has increased telephone minute allowances to counteract these limits on in-person interactions.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[2] Pursuant to the Coronavirus Aid, Relief, and Economic Security Act, BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General

---

[2] This authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). As of the date of this Memorandum, BOP has transferred more than 7,000 inmates to home confinement since March 26, 2020.

Unfortunately, some inmates and staff at various institutions have become ill. As of July 21, 2020, the date the Government filed a supplemental letter providing updates on the FDC's response to COVID-19, five inmates have tested positive at the FDC. However, these inmates tested positive during the automatic 14-day quarantine for new arrivals. There have not been any known positive cases of COVID-19 in the FDC general inmate population. Out of the five new arrivals to test positive, three have recovered, one is in isolation, and one was released at the completion of his sentence while still quarantined. Five staff members have also tested positive for the virus. Three have since returned to health, and the remaining two are not permitted to return to work at the FDC until they are recovered.

## LEGAL STANDARD

18 U.S.C.A. § 3142(i) provides, in part, that "[a] judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." "The defendant bears the burden of establishing circumstances warranting temporary release under § 3142(i)." *United States v. Veras*, No. 19-010, 2020 WL 1675975, at *3 (M.D. Pa. Apr. 6, 2020) (citing *United States v. Buswell*, No. 11-198-01, 2013 WL 210899, at *5 (W.D. La. Jan. 18, 2013)).

"In light of the COVID-19 pandemic, Section 3142(i)'s potential applicability is clear, but whether relief is warranted under that Section is considered on a case-by-case basis." *United States*

5

*v. Gongda Xue*, No. 18-122, ___ F. Supp. 3d ___, 2020 WL 2307339, at *5 (E.D. Pa. May 8, 2020). As this Court has explained:

> While there has been some discrepancy among courts about how these requests should be resolved, two guiding tenets have emerged. First, Section 3142(i) motions must be considered within the larger context of the requirements of the Bail Reform Act. Second, the generalized risk of COVID-19 is not, in and of itself, a sufficient reason to justify release. Thus, resolving Section 3142(i) motions requires an individual assessment of the movant's characteristics and circumstances in light of these two considerations.

*Id.*

In considering the larger context, "[t]he fundamental precept of the Bail Reform Act mandates the release of individuals so long as the court can be reasonably assured the defendant does not pose a flight risk or danger to the community." *United States v. Holland*, No. 10-243, 2020 WL 4260757, at *2 (M.D. Pa. July 24, 2020) (citing 18 U.S.C. § 3142). Therefore, the Court must assess whether conditions can be fashioned to assure that the person charged does not pose a flight risk or a danger to the community. *See United States v. Carter*, No. 18-561-1, 2020 WL 3412571, at *6 (E.D. Pa. June 22, 2020) (citing 18 U.S.C. § 3142). In assessing these conditions, "courts are directed to consider the factors enumerated in 18 U.S.C. § 3142(g)." *Id.* These factors include: (1) "the nature and circumstances of the offense charged"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person," including the person's character, health condition, community ties, resources, past conduct, and whether the person was on probation, parole, or other release at the time of the current offense or arrest; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4).

"In addition to these factors, the Bail Reform Act also requires district courts to weigh release decisions against certain statutory presumptions, including a presumption in favor of detainment for defendants charged with violent crimes or serious drug trafficking offenses."

6

*Carter*, 2020 WL 3412571, at *6. Subject to rebuttal, there is a statutory presumption that no condition or combination of conditions will reasonably assure the appearance of the person or the safety of the community if the Court finds that there is probable cause to believe that the person committed one of the offenses enumerated in 18 U.S.C. § 3142(e)(3). The Third Circuit Court of Appeals has held that "[an] indictment is sufficient to support a finding of probable cause triggering the rebuttable presumption of dangerousness under § 3142(e)." *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986).

"Cast against this comprehensive statutory scheme prescribing the procedure for making initial bail and detention decisions, § 3142(i) constitutes a limited safety valve provision, enabling courts to re-examine detention decisions 'to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.'" *United States v. Washington-Gregg*, No. 19-331, 2020 WL 1974880, at *5 (M.D. Pa. Apr. 24, 2020) (quoting 18 U.S.C. § 3142(i)). In the wake of COVID-19, "this re-examination does not take place in isolation," and courts have also evaluated the following factors:

> (1) the specificity of the defendant's stated COVID-19 concerns, (2) the original grounds for the defendant's pretrial detention, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others.

*Carter*, 2020 WL 3412571, at *6 (listing cases). "The court will not necessarily weigh these factors equally, but will consider them as a whole to help guide the court's determination as to whether a 'compelling reason' exists such that temporary release is 'necessary.'" *United States v. Denmark*, No. 19-15, 2020 WL 1984306, at *6 (M.D. Pa. Apr. 27, 2020) (quoting *United States v. Clark*, No. 19-40068-01, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020)).

Turning to the second tenet of motions under 18 U.S.C. § 3142(i), "courts have generally 'rejected emergency motions for release . . . based solely on the generalized risks that COVID-19

7

admittedly creates for all members of our society.'" *Carter*, 2020 WL 3412571, at *6 (quoting *Denmark*, 2020 WL 1984306, at *6). "Rather, at a minimum, courts have typically required proof of a defendant's particular vulnerability to the disease in order to constitute a compelling reason for release under § 3142(i)."[3] *Id.*

## DISCUSSION

Mr. Quail asserts two main justifications for his release: (1) the risk to his health posed by his asthma; and (2) an inability to adequately prepare his defense. He claims that his asthma places him at a high risk of serious illness or death should he contract COVID-19, and that the conditions at the FDC expose him to high-touch surfaces and inevitably result in close contact with others. Mr. Quail also contends that the FDC's lockdown has hindered his ability to view the discovery in his case, and the FDC's limitations on attorney visits restrains the development of his defense. He asserts that pretrial release would enable him to prepare his defense through regular telephone calls and videoconferences with counsel. Mr. Quail states that while on release, he would reside with his mother and comply with any conditions the Court imposes, such as home confinement and GPS monitoring.

Before addressing the arguments and the evidence, it bears recognizing the unprecedented magnitude of the COVID-19 pandemic. Indeed, to the extent correctional facilities may have successfully dealt with past viruses and outbreaks of communicable diseases, those diseases pale in scope with the apparent magnitude and speed of transmission of COVID-19 and the challenges associated with it. This virus comes in the form of a world-wide pandemic, resulting in a

---

[3] Our court of appeals has endorsed this approach in similar contexts evaluating whether COVID-19 may constitute a compelling reason for release. *See, e.g., United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.")

declaration of a national emergency and states of emergency by many states, along with various forms of business closures or modifications to operations and stay-at-home orders. Without known effective treatment at this time, and vaccines months (or more) away, public health officials urge people to practice "social distancing,"[4] frequent and thorough hand-washing, avoidance of close contact with others, and wearing masks during public interactions—all of which are understandably difficult to implement in a correctional or detention facility. Certainly, the Court takes this critical health risk seriously. But as concerning as the common calamity of COVID-19 is, resolving Mr. Quail's motion still calls upon the Court to seriously take into consideration the limits imposed pursuant to 18 U.S.C. § 3142(i).

Mr. Quail first claims that his asthma presents a compelling reason for his release in light of COVID-19. The Court disagrees.

The CDC recognizes only "moderate to severe asthma" as a risk factor for COVID-19. *See* CDC, *People with Moderate to Severe Asthma*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited August 3, 2020). Pursuant to the National Asthma Education and Prevention Program, an individual suffers from moderate persistent asthma if any of the following is true:

- Symptoms occur daily. Inhaled short-acting asthma medication is used every day.
- Symptoms interfere with daily activities.
- Nighttime symptoms occur more than 1 time a week, but do not happen every day.
- Lung function tests are abnormal (more than 60% to less than 80% of the expected value), and PEF [peak expiratory flow] varies more than 30% from morning to afternoon.

---

[4] Some have understandably suggested that this would be better thought of as "physical distancing," insofar as it is also strongly urged that maintenance of social interaction remains important for purposes of counteracting the negative emotional aspects of isolation.

9

UNIVERSITY OF MICHIGAN, *Classification of Asthma*, available at https://www.uofmhealth.org/health-library/hw161158 (last visited August 3, 2020). Mr. Quail and his mother claim that he has suffered from asthma since childhood, but they provide no further specificity. There are no medical records or other independent medical evidence demonstrating that Mr. Quail has been diagnosed with asthma or that any asthma he may have is moderate to severe. Accordingly, the Court cannot find that Mr. Quail is at any more risk from COVID-19 than any other inmate at the FDC, and "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify [] release." *Raia*, 954 F.3d at 597. Mr. Quail has failed to produce proof of his particular vulnerability to COVID-19.

The same lack of individualized concern applies to Mr. Quail's arguments related to his ability to prepare his defense. Although the Court acknowledges that institutions' efforts to quell the virus have, unavoidably, resulted in communication and collaboration difficulties between inmates and their counsel, this is true for every individual incarcerated. Mr. Quail has not shown that his ability to prepare his defense is impeded beyond that of any other FDC inmate, and the Court understands that BOP and the FDC recognize the paramount importance of communicating with legal counsel and are making efforts to facilitate inmates' access to counsel.

Even if the Court were to find that Mr. Quail had demonstrated an individualized vulnerability to COVID-19 or inability to prepare his defense, which he has not, the Court must also consider whether conditions could be fashioned to assure that Mr. Quail does not pose a flight risk or a danger to the community. Mr. Quail's charges in the Superseding Indictment carry a mandatory minimum of 10 years of imprisonment and a maximum possible life sentence. Accordingly, there is a rebuttable presumption that no conditions will reasonably assure his

appearance or the community's safety. *See* 18 U.S.C. § 3142(e)(3)(A). It is Mr. Quail's burden to produce evidence to rebut this presumption, and the Court finds he has failed to do so. Mr. Quail has been charged with serious crimes, he has previously engaged in criminal conduct while on supervision, he has been declared a fugitive, and he has fled from law enforcement once located. Furthermore, Mr. Quail claims he would live with his mother while on pretrial release, yet Mr. Quail's mother has provided false information to law enforcement on Mr. Quail's behalf in the past.[5] The Court has no evidence before it to assuage its concerns that Mr. Quail poses both a flight risk and a danger to the community, or to rebut the statutory presumption of detention.

Therefore, the Court finds that Mr. Quail has failed to meet his burden to demonstrate both compelling reasons justifying his release and that conditions exist that would assure he would not pose a flight risk or a danger to the community. Accordingly, he is not entitled to relief pursuant to 18 U.S.C.A. § 3142(i).

## CONCLUSION

For the foregoing reasons, the Court denies Mr. Quail's motion for release. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[5] The Court notes that Mr. Quail's mother did eventually tell the officers the truth about Mr. Quail's whereabouts.